**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Estate of Justin Shults | : | |
| By and through its Administratrix | : | |
| Sheila Shell | : | |
| 255 Poplar Lane | : | |
| Gatlinburg, TN 37728 | : | |
| | : | |
| and | : | Civil Action No. _____ |
| | : | |
| Sheila Shell | : | |
| 255 Poplar Lane | : | |
| Gatlinburg, TN 37728 | : | |
| | : | |
| and | : | |
| | : | |
| Jeffrey Shults | : | |
| 2565 Upper Middle Creek Road | : | |
| Sevierville, TN 37876 | : | |
| | : | |
| and | : | |
| | : | |
| Tiffany Shults-Ristine | : | |
| 7724 Dan Lane | : | |
| Knoxville, TN 37938 | : | |
| | : | |
| and | : | |
| | : | |
| Levi Sutton | : | |
| 2609 Bow Court | : | |
| Sevierville, TN 37876 | : | |
| | : | |
| and | : | |
| | : | |
| Estate of Stephanie Moore-Shults | : | |
| By and through its Executor | : | |
| Carolyn G. Moore | : | |
| 1867 Timber Creek Drive | : | |
| Lexington, KY 40509 | : | |
| | : | |
| and | : | |
| | : | |

1

Carolyn G. Moore      :
1867 Timber Creek Drive    :
Lexington, KY 40509     :
              :
and           :
              :
Geary Moore       :
1867 Timber Creek Drive    :
Lexington, KY 40509     :
              :
and           :
              :
Holly E. Wood       :
1867 Timber Creek Drive    :
Lexington, KY 40509     :
              :
and           :
              :
Estate of James Logan Gragg   :
By and through its Executrix   :
Glenda S. Gragg      :
1704 Silver lane      :
Lexington, KY 40505     :
              :
and           :
              :
Trella Elizabeth Newsom    :
2995 Runneymede Way     :
Lexington, KY 40503     :
              :
and           :
              :
Melchizedek Martinez     :
as the Statutory Heir of     :
The Estate of Gail Minglana Martinez :
12410 Loving Mill      :
San Antonio, TX 78253     :
              :
and           :
              :
Melchizedek Martinez     :
12410 Loving Mill      :
San Antonio, TX 78253     :            :
              :
and           :
              :

2

Kianni Martinez                                    :
12410 Loving Mill                                  :
San Antonio, TX 78253                              :
                                                   :
and                                                :
                                                   :
Ka.M.                                              :
By and through her Natural Guardian                :
Melchizedek Martinez                               :
12410 Loving Mill                                  :
San Antonio, TX 78253                              :
                                                   :
and                                                :
                                                   :
Ki.M.                                              :
By and through his Natural Guardian                :
Melchizedek Martinez                               :
12410 Loving Mill                                  :
San Antonio, TX 78253                              :
                                                   :
and                                                :
                                                   :
N.M.                                               :
By and through her Natural Guardian                :
Melchizedek Martinez                               :
12410 Loving Mill                                  :
San Antonio, TX 78253                              :
                                                   :
and                                                :
                                                   :
Rosie T. Martinez                                  :
8007 Hoosier Park                                  :
Selma, TX 78154                                    :
                                                   :
and                                                :
                                                   :
Maria Luisa Martinez                               :
8103 Ellerston Boulevard                           :
Selma, TX 78154                                    :
                                                   :
and                                                :
                                                   :
Angelito Minglana, Sr.                             :
2213 Burgundy Drive                                :
Corpus Kristie, TX 78418                           :
                                                   :

and                                          :
                                             :
Teofista Minglana                            :
2213 Burgundy Drive                          :
Corpus Kristie, TX 78418                     :
                                             :
and                                          :
                                             :
Gerard Minglana                              :
1750 Stoneman Drive                          :
Suisun City, CA 94585                        :
                                             :
and                                          :
                                             :
Gilda Minglana-Harwood                       :
73-4345 Palupalu Place                       :
Kailua-Kona, HI 96740                        :
                                             :
and                                          :
                                             :
Angelito Minglana, Jr.                       :
2213 Burgundy Drive                          :
Corpus Kristie, TX 78418                     :
                                             :
and                                          :
                                             :
Angelo Minglana                              :
7711 William Bonney                          :
San Antonio, TX 78254                        :
                                             :
                                             :
and                                          :
                                             :
Joseph D. Empey                              :
1513 West 610 N Cir                          :
St George, UT 84770                          :
                                             :
and                                          :
                                             :
Amber Orton-Empey                            :
619 Cynthia Lane                             :
Santa Clara, UT 84765                        :
                                             :
and                                          :
                                             :
Joseph C. Empey                              :

619 Cynthia Lane                    :
Santa Clara, UT 84765          :
                                      :
and                                  :
                                      :
D.E.                                :
By and through her Natural Guardians  :
Amber Otron Empey and Joseph C. Empey :
619 Cynthia Lane                    :
Santa Clara, UT 84765          :
                                      :
and                                  :
                                      :
H.E.                                :
By and through his Natural Guardians  :
Amber Otron Empey and Joseph C. Empey :
619 Cynthia Lane                    :
Santa Clara, UT 84765          :
                                      :
and                                  :
                                      :
Isabelle Empey                    :
1023 E. Linden Avenue         :
Salt Lake City, UT 84102       :
                                      :
and                                  :
                                      :
Abraham Empey                   :
789 S. 1100 E                  :
Salt Lake City, UT 84102       :
                                      :
and                                  :
                                      :
Richard I. Norby                  :
2889 North 50 West             :
Lehi, UT 84043                :
                                      :
and                                  :
                                      :
Pamela J. Norby                  :
2889 North 50 West             :
Lehi, UT 84043                :
                                      :
and                                  :
                                      :
Tiffany Allred                    :

372 North 525 East                          :
Delta, UT 84624                             :
                                            :
and                                         :
                                            :
Jason Norby                                 :
2927 North 50 West                          :
Lehi, UT 84043                              :
                                            :
and                                         :
                                            :
Chelsea Snell                               :
3711 East Ironhorse Road                    :
Gilbert, AZ 85297                           :
                                            :
and                                         :
                                            :
Mason Wells                                 :
1836 E. Mountain Crest Drive                :
Draper, UT 84020                            :
                                            :
and                                         :
                                            :
Chad S. Wells                               :
1836 E. Mountain Crest Drive                :
Draper, UT 84020                            :
                                            :
and                                         :
                                            :
Kymberly E. Wells                           :
1836 E. Mountain Crest Drive                :
Draper, UT 84020                            :
                                            :
and                                         :
                                            :
J.W.                                        :
By and through his Natural Guardians        :
Chad S. Wells and Kymberly E. Wells         :
1836 E. Mountain Crest Drive                :
Draper, UT 84020                            :
and                                         :
                                            :
M.W.                                        :
By and through her Natural Guardians        :
Chad S. Wells and Kymberly E. Wells         :
1836 E. Mountain Crest Drive                :

Draper, UT 84020                                      :
                                                     :
and                                                  :
                                                     :
T.W.                                                 :
By and through her Natural Guardians                 :
Chad S. Wells and Kymberly E. Wells                  :
1836 E. Mountain Crest Drive                         :
Draper, UT 84020                                     :
                                                     :
and                                                  :
                                                     :
Colby S. Wells                                       :
1836 E. Mountain Crest Drive                         :
Draper, UT 84020                                     :
                                                     :
                                    Plaintiffs       :
                                                     :
            v.                                       :
                                                     :
SYRIAN ARAB REPUBLIC                                 :
Damascus, SYRIA                                      :
                                                     :
                                                     :
                                                     :
                                    Defendant.       :
                                                     :

## **COMPLAINT**

Plaintiffs Estate of Justin Shults, Sheila Shell, Jeffrey Shults, Tiffany Shults-Ristine, and Levi Sutton (collectively the "Shults Plaintiffs"), Estate of Stephanie Moore-Shults, Carolyn G. Moore, Geary Moore, Holly E. Wood, Estate of James Logan Gragg, and Trella Elizabeth Newsom (collectively the "Moore Plaintiffs"), Melchizedek Martinez as the Statutory Heir of the Estate of Gail Minglana Martinez, Melchizedek Martinez, Kianni Martinez, Ka.M., Ki.M., N.M., Rosie T. Martinez, and Maria Luisa Martinez (collectively the "Martinez Plaintiffs"), , Angelito Minglana, Sr., Teofista Minglana,  Gerard Minglana, Gilda Minglana-Harwood, Angelito Minglana, Jr. and

Angelo Minglana, (collectively the "Minglana Plaintiffs"), Joseph D. Empey, Amber Orton Empey, Joseph C. Empey, D.E., H.E, Isabelle Empey and Abraham Empey (collectively the "Empey Plaintiffs"), Richard I. Norby, Pamela J. Norby, Tiffany Allred, Jason Norby and Chelsea Snell (collectively the "Norby Plaintiffs"), and Mason Wells, Chad S. Wells, Kymberly E. Wells, J.W., M.W., T.W., and Colby S. Wells (collectively the "Wells Plaintiffs"), bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* (hereinafter "FSIA").

This action arises out of the murders of Justin Shults, Stephanie Moore-Shults and Gail Martinez, and the personal injuries of Melchizedek Martinez, Kianni Martinez, Ka.M., Ki.M., N.M, Joseph D. Empey, Carolyn G. Moore, Richard I. Norby and Mason Wells during the coordinated suicide bombing terrorist attacks committed at the Brussels Airport in Brussels, Belgium on March 22, 2016 ("Brussels Airport Attack").

These bombings were carried out by a Foreign Terrorist Organization ("FTO"), THE ISLAMIC STATE (a.k.a. "ISIS," "ISIL," or "IS") so designated by the U.S. Department of State on December 17, 2004.  ISIS operated with the material support and resources provided by the SYRIAN ARAB REPUBLIC ("SYRIA" or "Syria") as a designated State Sponsor of Terrorism, having been so designated by the U.S. Department of State in 1979 and having remained so designated at all times referenced herein.

Justin Shults, Stephanie Moore-Shults, Carolyn G. Moore, Gail Martinez, Melchizedek Martinez, Kianni Martinez, Ka.M., Ki.M., N.M., Joseph D. Empey, , Richard I. Norby and Mason Wells were each the victims of, acts of "torture" and "extrajudicial killing" as defined in the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350, and/or "personal injury" as required by 28 U.S.C. § 1605A, thereby entitling the Plaintiffs, and each of them, as American victims of Syrian terrorism to bring this action and recover damages pursuant to applicable law; and also entitling the Plaintiffs who are each near-family members of each of the named victims to bring this action and recover damages pursuant to applicable law.

This matter is related to *Winternitz, et al v Syrian Arab Republic,* Civil Action Nos. 17-02104 (TJK) (D.D.C.) in that it involves the same terrorist attack and Syria's sponsorship of the same terrorist organization, ISIS, which has resulted in the death and injuries of American citizens.

Plaintiffs state in support of their Complaint and allege the following:

## THE PARTIES

**A.  The Plaintiffs**

**The Shults Plaintiffs**

1.      Plaintiff Estate of Justin Shults ("Justin"), a Sevier County, Tennessee estate, is represented in this action by its duly appointed Administratrix, Sheila Shell. Justin was, and at all times relevant hereto, the husband of Stephanie Moore-Shults. Justin was murdered in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Justin was a citizen of the United States. Justin was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff Estate of Justin Shults can sue and be sued in this Court.

2.      Plaintiff Sheila Shell was, and at all times relevant hereto, the biological mother of Justin Shults, and a citizen of the United States. Plaintiff Sheila Shell has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her son, Justin, in the Brussels Airport Attack. Plaintiff Sheila Shell can sue and be sued in this Court.

3.      Plaintiff Jeffrey Shults was, and at all times relevant hereto, the biological father of Justin Shults, and a citizen of the United States. Plaintiff Jeffrey Shults has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his son, Justin, in the Brussels Airport Attack. Plaintiff Jeffrey Shults can sue and be sued in this Court.

4.      Plaintiff Tiffany Shults-Ristine was, and at all times relevant hereto, the biological sister of Justin Shults, and a citizen of the United States. Plaintiff Tiffany Shults-Ristine has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her brother, Justin, in the Brussels Airport Attack. Plaintiff Tiffany Shults-Ristine can sue and be sued in this Court.

5.      Plaintiff Levi Sutton was, and at all times relevant hereto, the biological brother of Justin Shults, and a citizen of the United States. Plaintiff Levi Sutton has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his brother, Justin, in the Brussels Airport Attack. Plaintiff Levi Sutton can sue and be sued in this Court.

**The Moore Plaintiffs**

6.      Plaintiff Estate of Stephanie Moore-Shults ("Stephanie"), a Fayette County, Kentucky estate, is represented in this action by its duly appointed Executor, Carolyn G. Moore. Stephanie was, and at all times relevant hereto, the wife of Justin Shults. Stephanie was murdered in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto,

Stephanie was a citizen of the United States. Stephanie was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff Estate of Stephanie Moore-Shults can sue and be sued in this Court.

7.     Plaintiff Carolyn G. Moore was, and at all times relevant hereto, the biological mother of Stephanie Moore-Shults, and a citizen of the United States. Plaintiff Carolyn G. Moore was also at the Brussels Airport at the time of the attack by THE ISLAMIC STATE and was physically injured in the Brussels Airport Attack and was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Carolyn G. Moore has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of the murder of her daughter, Stephanie, in the Brussels Airport Attack.   Plaintiff Carolyn G. Moore can sue and be sued in this Court.

8.     Plaintiff Geary Moore was, and at all times relevant hereto, the biological father of Stephanie Moore-Shults, and the spouse of Carolyn G. Moore, and was a citizen of the United States. Plaintiff Geary Moore has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his daughter, Stephanie, and also as a result of the injuries to his wife, Carolyn G. Moore, in the Brussels Airport Attack. Plaintiff Geary Moore can sue and be sued in this Court.

9.     Plaintiff Holly E. Wood was, and at all times relevant hereto, the biological sister of Stephanie Moore-Shults, and daughter of Carolyn G. Moore and a citizen of the United States. Plaintiff Holly E. Wood has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her sister, Stephanie, and also as a result of the injuries to her

mother, Carolyn, in the Brussels Airport Attack. Plaintiff Holly E. Wood can sue and be sued in this Court.

10.     Plaintiff Estate of James Logan Gragg, a Fayette County, Kentucky estate, is represented in this action by its duly appointed Executrix, Glenda S. Gragg. James Logan Gragg was, and at all times relevant hereto, the biological brother of Carolyn G. Moore and a citizen of the United States. James Logan Gragg suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to his sister, Carolyn, in the Brussels Airport Attack. Plaintiff Estate of James Logan Gragg can sue and be sued in this Court.

11.     Plaintiff Trella Elizabeth Newsom was, and at all times relevant hereto, the biological sister of Carolyn G. Moore and a citizen of the United States. Plaintiff Trella Elizabeth Newsom has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her sister, Carolyn, in the Brussels Airport Attack. Plaintiff Holly E. Wood can sue and be sued in this Court.

**The Martinez Plaintiffs**

12.     Melchizedek Martinez as the Statutory Heir of the Estate of Gail Martinez ("Gail") is a Plaintiff in this action. Gail was, and at all times relevant hereto, the wife of Melchizedek Martinez. Gail was murdered in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Gail was a citizen of the United States. Gail was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" and "death" as required by 28 U.S.C. § 1605A. Plaintiff Melchizedek Martinez as the Statutory Heir of the Estate of Gail Martinez can sue and be sued in this Court.

13.    Plaintiff Melchizedek "Kato" Martinez was, and at all times relevant hereto, the husband of Gail Martinez, and a citizen of the United States. Plaintiff Melchizedek Martinez and all of his and Gail's children were also present at the Brussels Airport at the time of the attack committed by THE ISLAMIC ESTATE and he and each of the children named as Plaintiffs in this Complaint were physically injured in the Brussels Airport Attack and was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Melchizedek Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of the murder of his wife and injuries to himself and each of his children in the Brussels Airport Attack.   Plaintiff Melchizedek Martinez can sue and be sued in this Court.

14.    Plaintiff Kianni Martinez was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Plaintiff Kianni Martinez and all of her siblings and her father were also physically injured in the Brussels Airport Attack and was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Kianni Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff Kianni Martinez can sue and be sued in this Court.

15.    Plaintiff Ka.M. was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Ka.M. is a minor born March 7, 20XX who lives with her father and three of her siblings. Plaintiff Ka.M. and all of her siblings and her father were also physically injured in the Brussels Airport Attack and was, at all

times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Ka.M. has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff Ka.M. can sue and be sued in this Court.

16.     Plaintiff Ki.M. was, and at all times relevant hereto, the biological son of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Ki.M. is a minor born November 17, 20XX who lives with his father and three of his siblings. Plaintiff Ki.M. and all of his siblings and his father were also physically injured in the Brussels Airport Attack and was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Ki.M. has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of his own injuries and as a result of the murder of his mother and injuries to his father and each of his siblings in the Brussels Airport Attack. Plaintiff.  Ki.M. can sue and be sued in this Court.

17.     Plaintiff N.M. was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. N.M. is a minor born March 16, 20XX who lives with her father and three of her siblings. Plaintiff N.M. and all of her siblings and her father were also physically injured in the Brussels Airport Attack and was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. N.M. has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff N.M. can sue and be sued in this Court.

18.     Plaintiff Rosie T. Martinez was, and at all times relevant hereto, the biological mother of Melchizedek Martinez, and a citizen of the United States. Rosie T. Martinez has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her son in the Brussels Airport Attack. Plaintiff Rosie T. Martinez can sue and be sued in this Court.

19.     Plaintiff Maria Luisa Martinez was, and at all times relevant hereto, the biological sister of Melchizedek Martinez, and a citizen of the United States. Maria Luisa Martinez has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her brother in the Brussels Airport Attack. Plaintiff Maria Luisa Martinez can sue and be sued in this Court.

**The Minglana Plaintiffs**

20.     Plaintiff Angelito Minglana, Sr. was, and at all times relevant hereto, the biological father of Gail Martinez, and a citizen of the United States. Angelito Minglana, Sr.  has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his daughter in the Brussels Airport Attack. Plaintiff Angelito Minglana, Sr.  can sue and be sued in this Court.

21.     Plaintiff Teofista Minglana was, and at all times relevant hereto, the biological mother of Gail Martinez, and a citizen of the United States. Teofista Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her daughter in the Brussels Airport Attack. Plaintiff Teofista Minglana can sue and be sued in this Court.

22.     Plaintiff Gerard Minglana was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Gerard Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Gerard Minglana can sue and be sued in this Court.

23.     Plaintiff Gilda Minglana-Hardwood was, and at all times relevant hereto, the biological sister of Gail Martinez, and a citizen of the United States. Gilda Minglana-Hardwood has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her sister in the Brussels Airport Attack. Plaintiff Gilda Minglana-Hardwood can sue and be sued in this Court.

24.     Plaintiff Angelito Minglana, Jr. was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Angelito Minglana, Jr. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Angelito Minglana, Jr. can sue and be sued in this Court.

25.     Plaintiff Angelo Minglana was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Angelo Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Angelo Minglana can sue and be sued in this Court.

**The Empey Plaintiffs**

26.     Joseph D. "Dres" Empey was injured in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Joseph D. Empey was a United States citizen. Joseph D. Empey was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Plaintiff Joseph D. Empey can sue and be sued in this Court.

27.     Plaintiff Amber Orton-Empey was, and at all times relevant hereto, the biological mother of Joseph D. Empey, and a citizen of the United States. Plaintiff Amber Orton-Empey has

suffered severe mental anguish and extreme emotional pain and suffering as a result of her son, Joseph, being injured in the Brussels Airport Attack. Plaintiff Amber Orton-Empey can sue and be sued in this Court.

28.    Plaintiff Joseph C. Empey was, and at all times relevant hereto, the biological father of Joseph D. Empey, and a citizen of the United States. Plaintiff Joseph C. Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his son, Joseph D. Empey, being injured in the Brussels Airport Attack. Plaintiff Joseph C. Empey can sue and be sued in this Court.

29.    Plaintiff D.E. was, and at all times relevant hereto, the biological sister of Joseph D. Empey, and a citizen of the United States. Plaintiff D.E. is a minor born March 24,20XX who lives with her mother, father and one sibling. Plaintiff D.E. has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff D.E. can sue and be sued in this Court.

30.    Plaintiff H.E. was, and at all times relevant hereto, the biological brother of Joseph D. Empey, and a citizen of the United States. Plaintiff H.E. is a minor born May 17, 20XX who lives with his mother, father and one sibling. Plaintiff H.E. has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff H.E. can sue and be sued in this Court.

31.    Plaintiff Isabelle Empey was, and at all times relevant hereto, the biological sister of Joseph D. Empey, and a citizen of the United States. Plaintiff Isabelle Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff Isabelle Empey can sue and be sued in this Court.

32.     Plaintiff Abraham R. Empey was, and at all times relevant hereto, the biological brother of Joseph D. Empey, and a citizen of the United States. Plaintiff Abraham R. Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Joseph, being injured in the Brussels Airport Attack. Plaintiff Abraham R. Empey can sue and be sued in this Court.

**The Norby Plaintiffs**

33.     Richard I. Norby was injured in the Brussels Airport Attack which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Richard I. Norby was a United States citizen. Richard I. Norby was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Plaintiff Richard I. Norby can sue and be sued in this Court.

34.     Plaintiff Pamela J. Norby was, and at all times relevant hereto, the wife of Richard I. Norby, and a citizen of the United States. Plaintiff Pamela J. Norby has suffered severe mental anguish and extreme emotional pain and suffering as a result of her husband, Richard, being injured in the Brussels Airport Attack. Plaintiff Pamela J. Norby can sue and be sued in this Court.

35.     Plaintiff Tiffany Allred was, and at all times relevant hereto, the daughter of Richard I. Norby, and a citizen of the United States. Plaintiff Tiffany Allred has suffered severe mental anguish and extreme emotional pain and suffering as a result of her father being injured in the Brussels Airport Attack. Plaintiff Tiffany Allred can sue and be sued in this Court.

36.     Plaintiff Jason Norby was, and at all times relevant hereto, the son of Richard I. Norby, and a citizen of the United States. Plaintiff Jason Norby has suffered severe mental anguish and extreme emotional pain and suffering as a result of his father being injured in the Brussels Airport Attack. Plaintiff Jason Norby can sue and be sued in this Court.

37.     Plaintiff Chelsea Snell was, and at all times relevant hereto, the daughter of Richard I. Norby, and a citizen of the United States. Plaintiff Chelsea Snell has suffered severe mental anguish and extreme emotional pain and suffering as a result of her father being injured in the Brussels Airport Attack. Plaintiff Chelsea Snell can sue and be sued in this Court.

**The Wells Plaintiffs**

38.     Mason Wells was injured in the Brussels Airport Attack, which was committed by THE ISLAMIC STATE, a Foreign Terrorist Organization.   At the time of the acts alleged, and at all other times relevant hereto, Mason Wells was a United States citizen. Mason Wells was, at all times relevant hereto, a victim of "torture" as defined in the TVPA and "personal injury" as required by 28 U.S.C. § 1605A. Plaintiff Mason Wells can sue and be sued in this Court.

39.     Plaintiff Chad S. Wells was, and at all times relevant hereto, the biological father of Mason Wells, and a citizen of the United States. Plaintiff Chad S. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of his son, Mason, being injured in the Brussels Airport Attack. Plaintiff Chad S. Wells can sue and be sued in this Court.

40.     Plaintiff Kymberly E. Wells was, and at all times relevant hereto, the biological mother of Mason Wells, and a citizen of the United States. Plaintiff Kymberly E. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of her son, Mason, being injured in the Brussels Airport Attack. Plaintiff Kymberly E. Wells can sue and be sued in this Court.

41.     Plaintiff J.W. was, and at all times relevant hereto, the biological brother of Mason Wells, and a citizen of the United States. Plaintiff J.W. is a minor born October 5, 20XX who lives with his mother, father, and siblings. Plaintiff J.W. has suffered severe mental anguish and extreme

emotional pain and suffering as a result of his brother, Mason, being injured in the Brussels Airport Attack. Plaintiff J.W. can sue and be sued in this Court.

42.     Plaintiff M.W. was, and at all times relevant hereto, the biological sister of Mason Wells, and a citizen of the United States. Plaintiff M.W. is a minor born March 28, 20XX who lives with her mother, father, and siblings. Plaintiff M.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Mason, being injured in the Brussels Airport Attack. Plaintiff M.W. can sue and be sued in this Court.

43.     Plaintiff T.W. was, and at all times relevant hereto, the biological sister of Mason Wells, and a citizen of the United States. Plaintiff T.W. is a minor born August 28, 20XX who lives with her mother, father and siblings. Plaintiff T.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Mason, being injured in the Brussels Airport Attack. Plaintiff T.W. can sue and be sued in this Court.

44.     Plaintiff Colby S. Wells was, and at all times relevant hereto, the biological brother of Mason Wells, and a citizen of the United States. Plaintiff Colby S. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Mason, being injured in the Brussels Airport Attack. Plaintiff Colby S. Wells can sue and be sued in this Court.

**B.  The Defendant**

45.     Defendant SYRIAN ARAB REPUBLIC is a foreign state that was designated in 1979 as a State Sponsor of Terrorism pursuant to section 60 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620(A) of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, on December 29, 1979, and has remained so designated, continuously, ever since. SYRIA has been included on the U.S. State Department's list of State Sponsors of Terrorism longer than any other state.

46.     On December 17, 2004, the United States State Department designated THE ISLAMIC STATE as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act.

47.     Defendant SYRIA, at all times pertinent to this action, provided material support and resources to THE ISLAMIC STATE, enabling the terrorist organization to carry out a murderous campaign of terrorism in different countries across various continents and countries, including in Belgium. SYRIA is and has been a State sponsor of ISIS within the meaning of 28 U.S.C § 1605A, by providing them with funding, equipment, arms, direction, logistical support, and/or training for their terrorist activities. President Bashar Al-Assad presently rules Syria as a dictator and has done so continuously since 2000.

48.     President Bashar Al-Assad and the government of the Syrian Arab Republic performed acts within the scope of his office and/or other government departments and instrumentalities which provided material support and sponsorship to ISIS and caused the personal injuries resulting from the acts of terrorism described herein. Accordingly, as provided in 28 USC § 1605A(c), Defendant SYRIA has direct liability for its own acts, and vicariously liability for the acts of President Bashar Al-Assad and/or those of other governmental departments and instrumentalities of the Syrian Arab Republic.

49.     Defendant SYRIAN ARAB REPUBLIC is liable to Plaintiffs for their damages resulting from the acts of despicable and heinous terrorism described herein.

## JURISDICTION AND VENUE

50.     Jurisdiction over the subject matter of this case arises under 28. U.S.C §§ 1330(a), 1331, 1332(a)(2) and 1605A.

51.     SYRIA is subject to suit in the courts of the United States as a state sponsor of terrorism and for providing material support to and as participants in ISIS' activities pursuant to the FSIA and related statutes.

52.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

53.     28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, for wrongful death, personal injury, and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

## THE MARCH 22, 2016 ATTACK ON THE BRUSSELS AIRPORT AND THE BRUSSELS METRO TRAIN

54.     Early in the morning on March 22, 2016, Ibrahim el Bakraoui, Nadim Laachraoui, and Mohamed Abrini walked together through the Brussels Airport in Zaventem, Brussels, Belgium ("Brussels Airport" or "Airport") disguised as would-be travelers. All three of them were terrorists of THE ISLAMIC STATE and were carrying deadly bombs.

55.     Shortly before 8:00am local time, the three bombers separated to different places within the main terminal. At 7:58am, the first bomber detonated his bomb near a check-in row at the Brussels Airport ticket counters.

56.     Approximately 10 seconds later. The second bomber detonated his bomb near a second check-in row of ticket counters at the Brussels Airport. A third bomber was unable to detonate his bomb due to the force of the second explosion.

57.     Khaled el-Bakraoui detonated his bomb on the Brussels Metro just over an hour after the second Airport bomb, killing himself and many of the other passengers in his metro car.

58.     This explosion brought the total number of deaths to thirty-two (32) and injuries to at least three-hundred and forty (340).

59.     Immediately following the Brussels Airport and Metro Attacks, ISIS claimed responsibility for the terrorist bombings through a news agency affiliated with THE ISLAMIC STATE, the Amaq Agency.

60.     The Brussels Airport and Metro Attacks were each organized, committed and coordinated by ISIS.

61.     ISIS helped provide training, weapons, explosives, and other assistance in order to maximize the murderous capabilities of the terrorist attackers.

62.     Brussels was susceptible to attack due to the large number of native Belgians who have traveled to Syria to join ISIS and were permitted to return to Belgium because of their Belgian passports.

63.     Brussels is also a largely symbolic target as it is home to the European Union and NATO headquarters.

64.     The terrorists targeted international flight counters, murdering approximately thirty-two (32) people from fourteen (14) different countries including Belgium, Britain, China, France, Germany, Hungary, India, Israel, Italy, Morocco Netherlands, Peru, Poland, Sweden, and the United States.

65.     The terrorists attacked passengers as young as 20 and as old as 79, indiscriminately killing and maiming the elderly, women, and children. Videos show primary school aged children fleeing from the Airport after the explosions.

66. The Brussels Airport Attack was carried out by the suicide bombers, Ibrahim el Bakraoui, Khaled el-Bakraoui, and Nadim Laachraoui, all three of whom were born in Belgium.

67. A fourth would-be-bomber, fellow Belgian Mohamed Abrini, fled the Airport after the first two bombs went off but before his explosive detonated. Abrini was later apprehended and interrogated.

68. All four men are or were Belgian nationals of Moroccan descent.

69. Each and all of the terrorists acted on behalf of THE ISLAMIC STATE, with the support and aid of the SYRIAN ARAB REPUBLIC.

## THE MURDERED AND INJURED PLAINTIFF VICTIMS

70. Plaintiff victims include the Estates of (i) Justin Shults, (ii) Stephanie Shults, and (iii) Gail Martinez, each of whom were murdered in the Brussels Airport Attack. Plaintiff victims also include Carolyn G. Moore, Melchizedek Martinez, Kianni Martinez, Ka.M, Ki.M, N.M, Joseph D. Empey, Richard I. Norby and Mason Wells, each of whom suffered physical injuries in the Brussels Airport Attack.  Plaintiffs also include the near family members of each victim, each of whom are entitled to bring claims herein as a result of the death or injuries of their loved ones.

### Justin and Stephanie Shults

71. Justin and his wife Stephanie met at Vanderbilt University where they graduated in 2008. They married in 2011. Justin and Stephanie were both certified public accountants.

72. Justin Shults worked for a company called Clarcor, and often flew back and forth between the United States and Belgium.

73. Stephanie's job at Mars, Incorporated took Justin and Stephanie to Belgium in 2014 where they were living at the time they both were murdered at the hands of the ISIS terrorists in the Brussels Airport Attack.

74.     Stephanie's mother, Carolyn G. Moore, was visiting Justin and Stephanie in Belgium prior to and at the time of the attack. Carolyn was scheduled to fly home to Lexington, KY in the morning of the attack on March 22, 2016. Justin and Stephanie took Carolyn to the airport for her flight home.

75.     After saying their goodbyes outside of the security screening, a bomb was detonated murdering both Justin and Stephanie and also injuring Carolyn, all to their damage.

**Carolyn G. Moore**

76.     After having been driven to the Brussels Airport by her daughter Stephanie and son-in-law Justin, Carolyn G. Moore entered the Brussel Airport.  When the ISIS terrorists detonated their bombs, Carolyn G. Moore was thrown to the ground onto her back with great force and was knocked unconscious.

77.     Carolyn G. Moore had visited with Stephanie and Justin for a week in Belgium and was heading back to Kentucky on the morning of the attack. It was a cool morning and Justin had on no jacket. They all joked about that and how Stephanie and Carolyn were all bundled up.

78.     The three of them entered the airport together. Justin told his mother-in-law that she needed to pull her own suitcase so there would be no security issues.

79.     Initially Carolyn could see Stephanie and Justin as she stood in line. They were sitting in chairs facing the lines. As the section became more crowded, Carolyn was unable to see them anymore. Then she heard a loud boom and saw a big flash of light above her. She was thrown to the ground and knocked unconscious.

80.     Carolyn awoke to a young lady trying to pull her backpack from under her. The young lady grabbed her backpack and yelled "run" before running herself. Carolyn stood up and looked around. The floor was gray, and it looked like the ceiling was on the floor. Carolyn

remembers yelling for Stephanie for about a minute. After not being able to find Stephanie or Justin, Carolyn exited the airport through a broken window that had been shattered by the explosion.

81.    Carolyn told a woman she encountered outside the airport that she was looking for her daughter and son-in-law. The woman told Carolyn that everyone had to evacuate to a parking lot a few meters away and suggested that Stephanie and Justin may have been evacuated to another area.

82.    Carolyn was directed to some buses to be transported to safety to what she believed was a stadium. She went into an office and told them she was still looking for her daughter. They said they would look for her. They then connected Carolyn with a social worker who spoke English.

83.    Carolyn suffered hearing loss in the blast and could not hear from her right ear. She was given some medicine.

84.    Carolyn was taken to a hotel by the police where she waited to find her daughter and son-in-law and also waited for her family to arrive from the United States. Her husband, Geary Moore, and Justin's mother and stepfather, Sheila and Jon Shell, had flown to Belgium when they learned of the terrorist attack.  Carolyn, Geary and Justin's parents wanted to look for Justin and Stephanie at hospitals, but the social worker had no idea which hospital they could be at.  The families agonizingly remained in Belgium for about 4 or 5 days before they learned that Justin and Stephanie had been killed in the attack and their remains had been found. Their families were permitted to view the bodies before they were flown back to the United States for burial.

85.     The next day the Shults/Shell and Moore families flew home. After a few weeks, Justin and Stephanie's bodies were flown to Dover Airforce Base. The families held a combined funeral, and Justin and Stephanie are buried together in Lexington, KY.

86.     Carolyn has suffered greatly as a result of not only the heinous murder of her daughter and son in law, but also of her own physical and emotional injuries, all to her damage.

**Gail and Melchizedek Martinez, Kianni Martinez, Ka.M., Ki.M. and N.M.**

87.     Melchizedek "Kato" Martinez and his wife Gail and four children, Kianni, Ka.M, Ki.M. and N.M, were temporarily living in Brussels, Belgium as a family and were traveling to enjoy a family trip to Walt Disney World in Orlando, Florida.

88.     The family of six traveled together to the Brussels Airport at around 5:30am for their 9:30am flight. They stood in line at the airport to retrieve their tickets and check their luggage. Kato went to the rest room and came back. Gail was next to him. Kianni was to the right of him with the other Martinez children.

89.     At that moment, no less than three feet behind them, a terrorist denoted a bomb.

90.     Kato was blasted forward and knocked unconscious. He was in and out of consciousness for some time. When he came to, he realized he suffered significant injuries including to his left leg which was severely damaged.

91.     He looked around and realized that everyone who was within a 2 -foot range of the explosion appeared to be dead.

92.     Despite his severe injuries and pain, Kato's adrenalin allowed him to search for his family.  Kato found his daughter, Kianni, underneath a pile of bodies. Her left leg was blown apart. She was going into shock. After trying to comfort her, he continued searching for his wife and other children.

93.     Kato then found his wife, Gail. He tried to help her before realizing she did not have a pulse and he believed she was dead. However, he alerted the first responders and asked them to care for his wife, hoping that he was wrong, and that she was still alive.

94.     Unable to find his other children, Kato knew his adrenaline was subsiding and he was going into shock, and would probably lose consciousness soon, so he also asked the first responders to take Kianni. As the first responders were taking Kianni, Kato recalls her yelling "don't go".

95.     Kato eventually lost consciousness and the next thing he remembers, he was waking up and being resuscitated. He was taken to the hospital to be treated. He had 3rd degree burns over his entire body, a bullet wound in his left leg.  He also had a left ankle fracture, and shrapnel in his scalp, arms and legs.

96.     He eventually learned that all of his children were down the hall from him in the hospital also being treated for their injuries. Kianni's injuries included her left leg which was blown apart. She also had 3rd degree burns and shrapnel all over her body. Ki.M. injuries included 3rd degree burns over 40% of his body and he was in a coma. Ka.M. was also in a coma with 3rd degree burns all over and blast injuries to her legs.  His youngest daughter N.M.'s injuries included 3rd degree burns and blast injuries, all to the damage of each of the

**Joseph Dresden "Dres" Empey**

97.     Joseph Dresden ("Dres") Empey had been serving as a missionary for one year and nine months for The Church of Jesus Christ of Latter-day Saints ("Church") in the Paris, France, mission when he was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

98.     On the day of the attack, Dres Empey and two other fellow missionaries, plaintiffs Richard Norby, an Elder of the Church, and Mason Wells were at the airport's check-in hall accompanying a fourth missionary, who was on her way to a mission assignment in Ohio, when the ISIS terrorists detonated their explosives.

99.      After waiting in the line to check in for her flight for only a few minutes, the bomb exploded. Dres was knocked unconscious by the blast.

100.    After a few minutes, Dres regained consciousness. As he came back into consciousness, he heard an extremely loud ringing in his ears and people yelling. He had no idea what had just happened until the memory of the fact that he was just standing in a line at the airport came back to him. He was laying on his right side, and as he opened his eyes, he saw mostly gray and smoke. When he tried to stand up, he saw people lying all over the floor.

101.    He realized that there had been an explosion. His first thought was to look for the other three people in his group. He walked around and saw the different people lying on the floor. Many of them were screaming and asking for his help. After looking with no success, Dres went to a large concrete pillar and stood behind it for a second with the fear that there still might be more terrorists or an additional attack. The front doors of the airport were 10-15 meters in front of him, and after leaning against that square pillar for a short while, he moved to the front door.

102.    Immediately after exiting, Dres found another of his fellow missionaries alive but also injured. It was Mason Wells.

103.    As Dres was talking with Mason, he looked over and saw a man in a suit laying on the ground that he thought might be Richard Norby. He limped over to the man in the suit and confirmed that it was indeed Richard Norby. He was severely injured. He appeared to have suffered burns and a severe injury to his leg; which had been snapped in the opposite direction.

104.     After a while, first responders came to attend to Dres and the others. He then received an IV with pain medication. He was placed in an ambulance and taken to the hospital. Once arriving at the hospital, Dres was taken out of the ambulance and began receiving treatment.

105.     As a result of the bombing, Dres suffered severe burns and injuries.  Recovery from his injuries has been an extensive process.  He spent a few weeks in recovery in Brussels and then subsequently for an extended period after he returned home to the United States, all to his damage.

**Richard Norby**

106.     Richard Norby had been serving as missionary President for The Church of Jesus Christ of Latter-day Saints ("Church") when he was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

107.     While waiting in line at the check-in counter with his fellow missionaries, Richard Norby was severely injured when ISIS terrorists detonated a bomb. Richard recalls a loud explosion, chaos and being thrown to the ground. He could see the smoke and destruction. He looked at his hands and thought it was soot, so he tried to wipe it off only to realize that his skin was coming off. Approximately 10 seconds later, another bomb was detonated.  He was trying to gain his footing and run only to realize that his leg was also injured, and he collapsed to the ground. He called his wife, Pam, who was living with him in Belgium.

108.     Pam recalls Richard calling her and telling her he had been injured in the terrorist attack at the Brussels Airport and they had been burned and thought his leg was broken.  Hearing this from Richard made Pam feel helpless that she was unable to be with her husband and assist. He was listening to the screams and cries of people that he was unable to assist. Pam was distraught and fearful for Richard and felt helpless as she was not there.

109.     Richard next recalls waking up in a triage area adjacent to the airport. They put placards on each person that were color coordinated by priority. Richard was in the airport triage area for about 2 hours before he was transported to a hospital.

110.     Richard's injuries were significant. They included 2nd and 3rd degree burns over 35% of his body. His fibula was broken in two places, his heel was fractured, and his body was littered with shrapnel from head to toe.

111.     He had to have staples in the back of his head. The punctures on his back were too wide to staple so they just had to heal. He has skin grafts on his right hand. His left hand had shrapnel that caused nerve damage

112.     Richard's right leg had a wound seven inches long, his calf had a shrapnel would that was two inches wide and a half inch deep.

113.     While in the hospital, Richard developed a fever and was showing signs of significant blood loss.  Richard had additional surgery to remove a large piece of shrapnel that was causing the bleeding. He also had issues with his toes because of nerve damage from the right leg.

114.     Richard continues to experience lack of function and pain as a result of his injuries.

115.     He has needed additional treatment and surgeries because of his permanent injuries and experienced long-term difficulties in his recovery, all to his damage.

**<u>Mason Wells</u>**

116.     Mason Wells, a missionary for The Church of Jesus Christ of Latter-day Saints, was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

117.    He was there with his fellow missionaries, Plaintiffs Richard I. Norby and Joseph "Dres" Empey and another female missionary who they were accompanying to the airport for her flight back to the United States.

118.    The group was waiting in the line to check in the female missionary for her flight when the first bomb exploded. Mason recalls the force of the blast catapulting him a distance from where he has been standing.

119.    When Mason realized what had happened, he became overcome by fear, uncertainty, and the threat of death.

120.    As the smoke cleared, all Mason could think about was his fellow missionaries and the need to get out of the airport to safety. However, his injuries made that a challenging feat. His legs and foot had been shredded by shrapnel and he was burned all over. Although he was afraid to try to move, he was even more afraid to stay where he was.

121.    Mason finally mustered up the energy and bravery to make a run for it. He dragged his bloodied and mangled body out of the airport and collapsed onto the sidewalk where he was cared for by a young woman.

122.    A few minutes later, Mason was delighted to see that his fellow missionary, Joseph Dresden Empey, and also Mission President Richard Norby, although also severely injured, had also made it out of the airport to safety.

123.    Mason's injuries were very severe. He had third degree burns, numerous lacerations, a cracked heel bone and a ruptured Achilles tendon. Mason spent the next two months in hospitals; first in Belgium, then back home in Utah. He underwent numerous surgeries and surgical procedures and was told he may never run again.

124.     Mason has scars all over the lower half of his body and continues to deal with the trauma of the horrific memories of that day, all to his damage.

## THE MEMBERS OF THE BELGIAN CELL ARE ISIS AGENTS

125.     The four ISIS perpetrators of the attacks all had connections to Syria. Each of the terrorists were members of the Brussels ISIS cell and had traveled to and visited Syria, where they received training and support and were recruited for their eventual operation by ISIS operatives in Raqqa, Syria.

126.     In June 2015, Bakraoui was arrested in Turkey while attempting to enter Syria and was deported back to Europe. Laachraoui traveled to Syria in February 2013.

127.     For his part, Abrini moved to Raqqa, Syria in 2015, to visit the grave of his deceased brother Soulaymane.

128.     This Belgian ISIS Cell (as well as the ISIS terrorists who were part of the Paris ISIS cell which committed the terror attack in Paris, France) in late 2015 is believed to have been run by Abdelhamid Abaaoud, known by his ISIS *nom de guerre* Abu Aomar al Beljiki.

129.     According to Abrini, Abaaoud, a Belgian national, was an ISIS "emir," who commanded 1000 men in Raqqa, including many Belgians and Frenchmen.

130.     Abaaoud reportedly headed a unit focusing on repatriating European-origin jihadis in Syria back to their countries of origin to perpetrate terrorist attacks.

131.     In July 2015, a Belgian court sentenced Abaaoud in absentia (as he was believed to then be in Raqqa, Syria) to 20 years in prison, for his role as a principal recruiter of European jihadis for ISIS.

132.     Abaaoud recruited Abrini during his 2015 trip to Raqqa, and later dispatched him from Syria to England to pick up $3800 to deliver to Abaaoud's brother, another ISIS operative.

133.    Abaaoud was eventually killed by French police during a nationwide manhunt following the Paris ISIS 2015 attacks. Before his death, according to former French C/T official Jean Charles Brisard, Abaaoud boasted that he had brought "90 jihadis to Europe" from Syria.

134.    Abaaoud was believed to have served as a direct link between Raqqa-based ISIS leadership and terror cells in Europe.

135.    Another key Raqqa-based point of command and control was Osama Attar, known as Abu Ahmed.

136.    Attar, a Belgian national, initially traveled to Iraq in 2002 to fight against the United States.

137.    He was later arrested, and imprisoned in Camp Bucca, where he is thought to have meet Abu Bakr al-Baghdadi.

138.    The Bakraoui brothers, who perpetrated suicide attacks in the Brussels Airport and on the Brussels Metro in Molenbeek, were Attar's cousins.

139.    In Raqqa, Syria, Attar was responsible for the preparation of terror cells, including military training, providing them with false passports, communication devices, contacts with facilitators and smugglers as well as money.

140.    From Syria, in the planning stages of the Brussels attacks, Attar exchanged encrypted messages with Laachraoui, providing operational instruction and guidance.

141.    When the safe house of Laachraoui's cell was raided and the group lost the ammunition for assault rifles, for example, Attar advised him to use explosives instead of guns.

142.    Attar also received [and caused to be publicly published] the last wills of the Brussels bombers.

143.     The contacts between the Brussels cell and Attar were confirmed by information discovered on Bakraoui's computer, which was retrieved from a garbage bin near the safe house from which the Brussels Airport attack was launched. Bakraoui and Laachraoui briefed Attar for the last time the day prior to the Brussels Airport and Metro attacks.

144.     Police recovered 15kg of TATP high explosive, chemicals, detonators, bomb-making materials, and an ISIS flag at the apartment where a taxi driver picked up Bakraoui, Laachraoui, and Abrini.

145.     The same explosive materials and chemicals were used by the ISIS cell that had committed the terrorist attack in Paris a few months earlier.

146.     The Brussels Airport and Metro Attacks were designed to send a message of fear, terrorist threat, coordination and power; and are one of many terrorist attacks that ISIS, operating from within Syria, and elsewhere, and with the material support of the Syrian Arab Republic has directly supported, carried out, or inspired.

147.     In January 2015, Amedy Coulibaly and three other terrorists had attacked the headquarters of a satirical French newspaper *Charlie Hebdo*. During the attack, Coulibaly called CNN and reported that he belonged to THE ISLAMIC STATE, which subsequently claimed responsibility for the attack.  Police later found ISIS flags in Coulibaly's apartment.

148.     THE ISLAMIC STATE is determined to use terror attacks against Americans and other freedom loving people.  Some additional ISIS attacks are enumerated below, as they demonstrate the pattern of heinous terror committed by ISIS and with the material support of the Syrian Arab Republic.

149.     On January 27th, 2015, gunmen in Tripoli, Libya, attacked a hotel, killing nine people including one American. The attack was claimed by ISIS, operating from Syria and

elsewhere and included a car bomb and grenades. Two days later, ISIS jihadists bombed Egyptian security forces, killing fifty (50) people. Of the fifty (50), fourteen (14) were civilians.

150.    On November 13, 2015, ISIS organized and coordinated multiple attacks in Paris, with the material support of the Syrian Arab Republic killing one-hundred and thirty (130) people and wounding hundreds more.

151.    The Paris attacks consisted of three teams including suicide bombers and men armed with assault rifles.

152.    A suicide bomber also attacked the Stade de France in Paris during an international soccer game between France and Germany where then-President of France Francois Hollande was in attendance.

153.    Around the same time, gunmen attacked on the street Rue Albert and at a restaurant and bar. Meanwhile, in the center of Paris other shootings were beginning.

154.    The deadliest attack occurred at Bataclan Hall in Paris, France, a concert venue where eighty-nine (89) people died and at least ninety-nine (99) others were taken to the hospital in critical condition.

155.    THE ISLAMIC STATE is believed to have committed each of these attacks and has been overtly and covertly supported and aided by the Defendant, the Syrian Arab Republic, in numerous material ways, contributing to the deaths and maiming caused by ISIS, operating from Syria and elsewhere.

156.    Defendant's sponsorship of, and provision of material support and resources to, ISIS must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of Syria's long, storied and sordid history of employing terrorism as a tool for heinously maiming and killing in advancing its domestic and international agendas.

## SYRIA'S SPONSORSHIP OF AND PROVISION OF MATERIAL SUPPORT AND RESOURCES TO THE ISLAMIC STATE

157.    The Syrian Arab Republic is a republic in name only. In reality, it is a dictatorship and police state that strategically exhibits only the external forms of a democratic regime.

158.    Until a February 2012 referendum, its constitution vested one particular party – the Arab Socialist Ba'ath Party –with leadership functions in the State and society.

159.    In 1966, Syrian Ba'athists conducted a coup d'état. The Ba'athists eliminated all political parties in opposition.

160.    Hafez Al-Assad, the now deceased father of the current President of the Syrian Arab Republic, was appointed Minister of Defense in approximately 1966. Hafez Al-Assad led another coup in 1970, in which the Ba'ath party was purged of internal opposition, its leaders were jailed, and Hafez Al-Assad was installed as President of the police state.

161.    The Al-Assad family has controlled the Syrian regime without interruption for forty years, since 1971.

162.    Hafez Al-Assad had a three-decade Presidency, lasting from 1971 to 2000, in which he was confirmed President in unopposed referenda five consecutive times.

163.    He was succeeded by his son Bashar Al-Assad in 2000. Bashar Al-Assad was confirmed as President, leader of the Ba'ath Party and leader of the Army, for a 7-year term, by an unopposed referendum held in 2001 in which he claimed 97.2% of the vote.

164.    He was re-appointed in another unopposed referendum in 2007, this time claiming 97.6% of the vote.

165.    In 2014, Bashar Al-Assad was reelected to a third 7-year term, claiming 88.7% of the vote with polling only allowed in government-held territory.

166.    Members of President Al-Assad's own minority sect, the Al-Awali clan, control most key positions in the Syrian military and Syrian intelligence and security services.

167.    The Ba'ath Party is heavily influenced by the Syrian military and Syrian intelligence and security services, the latter consuming a large share of Syria's economic resources.

168.    The President and his senior aides in the Syrian military and Syrian intelligence and security services make most important decisions in Syrian political and economic life.

169.    There are more than a dozen security services in Syria, some overlapping in their domains, to make sure that the whole of Syrian territory is covered. These security services answer directly to President Bashar Al-Assad and his brother General Maher Al-Assad, commander of the Syrian Republican Guard.

170.    The Asaad Regime supported ISIS in many ways, including releasing jihadist terrorists – not just foot soldiers but senior Islamic State leaders and operatives.

171.    A Syrian intelligence officers said, "the regime did not just open the door to the prisons and lets these extremists out, it facilitated them in their work, in their creation of arms brigades."

172.    It is clear that support for ISIS from Syrian territory and/or Syrian government actors, on the scale required to facilitate ISIS, could not have been accomplished without the explicit authorization of the Syrian government and Syrian Military Intelligence through President Al-Assad.

173.    A U.S. Department of State Bulletin published in 1987 states: "Available evidence indicates that Syria prefers to support groups whose activities are generally in line with Syrian objectives rather than to select targets or control operations itself. Damascus utilizes these groups to attack or intimidate enemies and opponents and to exert its influence in the region. Yet at the

38

same time, it can disavow knowledge of their operations. Such Syrian-supported groups have carried out scores of attacks against various countries, including, in Lebanon, in Turkey, and against Israeli, and Western European targets. Syria has provided material support and sponsorship not only to ISIS, but to HAMAS, Hezbollah, and Palestinian Islamic Jihad, among other terrorist organizations and terrorists.

174.    Syrian government support for the terrorist network that morphed into ISIS goes back many years, to include support for foreign fighters traveling through Syria to join al Qaeda in Iraq (AQI, and specifically the terrorist network led by Abu Musab al Zarqawi which later became ISIS).

175.    ISIS, in its early incarnation as the Zarqawi organization, benefited from Syrian safe haven and support; it maintained a logistical facilitation network in Syria which helped plan operations and funded and trained operatives who carried out attacks in Jordan; and its network in Syria provided financial and operational support to its compatriots fighting in Iraq. The Zarqawi organization has long benefited from a network of associates in Syria that it uses to facilitate travel to Iraq, and other logistics for members of its European network. Over an extended period of time, the Zarqawi network in Iraq—which later renamed itself as the Islamic State group—received financial and operational support from supporters in Syria.  Accordingly, ISIS, first in its early incarnation as the Zarqawi organization, benefited from Syrian safe haven and support, maintained a logistical facilitation network in Syria which helped plan operations and funded and trained operatives who carried out attacks.

176.    ISIS occupies a large portion of eastern Syria and western Iraq, having established its headquarters in Raqqa, Syria. Significantly, there are vast Syrian oil fields in the areas under its control from which ISIS is able to drill and collect gas and oil.

177.    ISIS gas and oil sales, including to the Syrian Arab Republic, have become its largest source of money, surpassing travel tolls, private donations, and all other sources of revenue allowing ISIS to maintain control of its so-called "caliphate."

178.    Syria knowingly provides materials support to ISIS and purchases oil from ISIS as part of its close economic cooperation with THE ISLAMIC STATE. Oil and gas sales are ISIS' largest source of funds with the vast majority of its oil sales to the Syrian government and also to private Iraqi buyers. As of 2014, sales to Syrian and Iraqi buyers, including Bashar Al-Assad's government, accounted for $1 million in revenues for ISIS per day.

179.    The Assad regime also purchased and sold grain from areas under the control of the Islamic State.  The Syrian regime also supported the financing of ISIS by allowing Syrian banks to continue to function and provide financial services within ISIS-held territory.  In other words, while the rest of the international community was actively seeking to deny ISIS access to oil revenue and banking facilities, the Assad regime was providing ISIS access to both.  The Government of Syria also looked the other way and turned a blind eye while allowing ISIS to conduct financial transactions through informal financial networks as well, even once these illicit terror-financing channels were publicly exposed.

180.    In addition to economically supporting ISIS, the regime uses ISIS to further its political agenda - as it has historically used other designated terrorist organizations. By pursuing policies that help ISIS maintain control and bolster its forces, Syria has attempted to gain support of western governments. Syrian intelligence agencies were deeply involved in the Assad regime's efforts facilitating and providing cover for the terrorist pipeline that ran through Syria into Iraq and helped build up al Qaeda in Iraq, which later became ISIS.

181.    Furthermore, the Syrian regime frequently refrained from attacking Islamic State group positions. Formers U.S. Ambassador to Syria Robert Ford said, "[t]he regime is basically not fighting them. They're letting them go. There is a huge headquarters in Raqqa for the Islamic State."

182.    Charles Lister, author of *The Syrian Jihad: Al-Qaeda, the Islamic State, and the Evolution of an Insurgency,* testified before the House Committee on Foreign Affairs stating, "the Assad regime appears to have repeatedly allowed – or potentially even facilitated – the movement of ISIS militants through regime-held territory and onto new frontlines on which it can fight the opposition."

183.    According to the U.S. Treasury Department, in 2014 "ISIL may have earned as much as several million dollars per week, or $100 million in total, from the sale of oil and oil products to local smugglers who, in turn, sell them to regional actors, notably the Assad regime.

184.    The relationships built between AQI/ISIS fighters and Syrian intelligence officers and agencies, going back to 2001-2002, helped these fighters over time to become the dangerous terrorists of the Islamic State group.

185.    The Syrian regime has for the longest time largely enabled ISIS solders, allowing them to occupy Syrian cities.

186.    It is well known that ISIS' headquarters are in Raqqa, Syria – where, according to the U.S. Department of State, from which ISIS plots most of its external operations including but not limited to the 2016 Brussels Airport attack.

187.    The U.S. Department of State, in its 2015 Country Reports on Terrorism, found that Syria continues to embrace terrorism as an instrument of policy.

188.    The report further noted ISIS operatives who helped carry out attacks all over the world remain at large in Syria where they receive safe harbor despite being wanted by neighboring and western governments.

189.    The report also expresses concerns about the proliferation of weapons that Syria has been giving to FTOs.

190.    Additionally, it states that the Syrian government has created an environment which encourages terrorist recruits to come to Syria and enables FTOs, specifically ISIS, to plot external attacks where they receive training, funding, protection and free passage without fear of being stopped or imprisoned.

191.    Syria has continued to be continuously designated as a State Sponsor of Terrorism since 1979 and has continued to sponsor designated FTOs in an unrepentant and unapologetic manner, intentionally providing material support, logistics, safe haven, aid and assistance to those who maim and kill innocent American citizens and others through acts of terrorism.

192.    The provision of material support and resources to THE ISLAMIC STATE, a known and designated FTO, by the Syrian government, acting directly and by and through individual governmental leaders, representatives and instrumentalities as named in this Complaint, constitute violations of applicable and numerous United States laws, thereby rendering the Syrian Defendant liable for its illegal acts and deeds, all to the damage of the Plaintiffs, and each of them.

**COUNT I**
**28 U.S.C. § 1605A(c), PRIVATE RIGHT OF ACTION**
(On behalf of All Plaintiffs)

193.    Paragraphs 1 through 192 are incorporated herein as if fully set forth herein.

194.    The Syrian Arab Republic was and is a state sponsor of terrorism as described in 28 U.S.C. § 1605A(a)(2)(A)(i).  Defendant and its agents were acting within the scope of their office,

employment, or agency in committing the acts alleged herein, including planning and carrying out the Brussels Airport on March 22, 2016.

195.    As a direct and proximate result of the willful, wrongful, intentional, reckless and heinous acts of ISIS members, whose acts were funded and supported by the Syrian Arab Republic and its agents and instrumentalities, Plaintiffs suffered, *inter alia*, wrongful death and/or physical pain and suffering, mental anguish, emotional pain and suffering, solatium damages and/or economic losses resulting from Defendant's acts.

196.    Pursuant to 28 U.S.C. § 1605A(c), Plaintiffs, each of whom are U.S. nationals may assert a cause of action against Defendant for their personal injuries, including but not limited to, their wrongful death and/or physical pain and suffering, mental anguish, emotional pain and suffering, solatium damages and/or economic losses that were caused by the provision of material support or resources for such an act performed or provided by an official, employee, or agents or instrumentalities of Defendant while acting within the scope of his or her office, employment, agency or instrumentality.

197.    Accordingly, as a result of Defendant's actions, Plaintiffs seek compensatory damages for the heinous acts of murder and maiming committed by THE ISLAMIC STATE with the material support of the SYRIAN ARAB REPUBLIC.

198.    WHEREFORE, each and all of the Plaintiffs demand that judgment be entered against the Defendant the Syrian Arab Republic in such amounts as are permitted by law and in accordance with this Court's prior determinations of awards and Judgments on behalf of similarly situated Plaintiffs for their compensatory damages, and otherwise as permitted by this Court.

## COUNT II
## LOSS OF SOLATIUM

(On behalf of All Plaintiffs Except the Estate of Justin Shults, the Estate of Stephanie Moore-Shults, Melchizedek Martinez as the Statutory Heir of the Estate of Gail Martinez, Joseph Empey, Richard Norby and Mason Wells)

199.    Paragraphs 1 through 198 are incorporated herein as if fully set forth.

200.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendant, the Plaintiffs/family members of each and all of the named victims suffered extreme mental anguish, emotional pain and suffering, and the loss of the society and companionship of the victims.

201.    Accordingly, the Plaintiffs near family members bring claims for loss of solatium against the Defendant the Syrian Arab Republic pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia.

202.    WHEREFORE, the individual Plaintiffs near-family member demand that judgment be entered against the Defendant the Syrian Arab Republic in an amount to be proven for their compensatory damages, and otherwise as permitted under applicable law by this Court arising out of the heinous acts of murder and maiming committed by THE ISLAMIC STATE with the material support of the SYRIAN ARAB REPUBLIC.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(On behalf of All Plaintiffs)

203.    Paragraphs 1 through 202 are incorporated herein as if fully set forth.

204.    On March 22, 2016, members of ISIS, with the support and aid of the Defendant, willfully, violently, and forcefully caused explosive device(s) to detonate at the Brussels Airport.

205.    The acts of detonating explosive charges at the Brussels Airport on March 22, 2016 constituted extreme and outrageous conduct on the part of ISIS members, whose acts were

intended to cause the infliction of physical and emotional harm and distress upon the injured and killed victims, and their families, and which were funded and supported by the Defendant Syrian Arab Republic.

206.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of ISIS members, whose acts were funded and materially supported by the Syrian Arab Republic, Plaintiffs suffered severe emotional distress, entitling them to compensatory damages for the heinous acts of murder and maiming committed by THE ISLAMIC STATE with the material support of the SYRIAN ARAB REPUBLIC.

207.    Each Plaintiff may assert a cause of action for intentional infliction of emotional distress against Defendant in connection with the willful, wrongful, intentional, and reckless actions of ISIS members.  Such cause of action may be asserted pursuant to 28 U.S.C. § 1605A(c), or, in the alternative, the laws of the District of Columbia.

208.    WHEREFORE, Plaintiffs and each of them demand that judgment be entered against the Defendant the Syrian Arab Republic in an amount to be proven for their compensatory damages, and otherwise as permitted by this Court for the heinous acts of murder and maiming committed by THE ISLAMIC STATE with the material support of the SYRIAN ARAB REPUBLIC.

## COUNT IV
## PUNITIVE DAMAGES
(On Behalf of All Plaintiffs)

209.    Paragraphs 1 through 208 are incorporated by reference as though fully set forth herein.

210.    As a direct and proximate result of the willful, wrongful, intentional, and reckless acts of Defendant, each of the Plaintiffs suffered extreme mental anguish, emotional pain and

suffering, and the loss of the society and companionship and solatium as a result of being killed or injured in the attack or as a result of their near-family member being killed or injured in the Brussels Airport attack.

211.     Under 28 U.S.C. §1605A and/or state and foreign law, the Plaintiffs, and each of them, are entitled to an award of punitive damages to be assessed and awarded against the Defendant for its heinous, reprehensible and unforgiving conduct in sponsoring and supporting the perpetration of unrelenting terror upon the United States of America, her citizens, and the Plaintiffs, and each of them.

212.     The purposes of punitive damages is to punish, for retribution and to deter further acts of terror by the Defendant and other terror organizations and those who provide material support for the sponsorship of terror.  This allows, and under the circumstances requires, a message to be sent by this Court to the Syrian Arab Republic that its past and ongoing continued sponsorship of terror will not be countenanced by this Court nor by the United States of America.  An award of punitive damages should be assessed against the Defendant, and Judgment should be entered on behalf of the Plaintiffs, and each of them, in such amount of punitive damages as determined by the Court, to be shared among them in direct proportion to the other damages awarded to each of the Plaintiffs, and as the interests of justice may allow for the heinous acts of murder and maiming committed by THE ISLAMIC STATE with the material support of the SYRIAN ARAB REPUBLIC.

213.     WHEREFORE Plaintiffs demand that judgment be entered for punitive damages, jointly and severally, against Defendant, in an amount to be determined by the Court.

### PRAYER FOR RELIEF

WHEREFORE Plaintiffs, pray that the Court:

A.  Grant Plaintiffs judgment in their favor against Defendant Syrian Arab Republic on Counts

   I through IV; and

B.  Award Plaintiffs, and each of them;

   1.  Compensatory damages against Defendant, the Syrian Arab Republic in the

   amounts to be proven before this Court;

   2.  Solatium damages against Defendant, the Syrian Arab Republic, in the

   amounts to be proven before this Court;

   3.  Punitive damages against Defendant, the Syrian Arab Republic, in the

   amount to be determined by the Court;

   4.  Reasonable costs and expenses;

   5.  An award of reasonable attorneys' fees; and

Such other and further relief which the Court may determine to be just and equitable

under the circumstances and as permitted under applicable law for the heinous acts of terror

committed by THE ISLAMIC STATE and materially supported by the Defendant Syrian Arab

Republic.

Dated: September 14, 2021                    Respectfully submitted,

                                             HEIDEMAN NUDELMAN & KALIK, PC
                                             5335 Wisconsin Ave, Suite 440
                                             Washington, DC 20015
                                             Telephone:  202-463-1818
                                             Telefax:      202-463-2999

                                             By:   /s/  *Richard D. Heideman*
                                                  Richard D. Heideman (No. 377462)
                                                  Noel J. Nudelman (No. 449969)
                                                  Tracy Reichman Kalik (No. 462055)
                                                  Joseph H. Tipograph (No. 997533)

                                             *Counsel for All Plaintiffs*