UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ESTATE OF JUSTIN SHULTS et al.,

        *Plaintiffs*,

    v.

SYRIAN ARAB REPUBLIC,

        *Defendant*.

Civil Action No. 21-2417 (TJK)

## MEMORANDUM OPINION

Three groups of Americans—two families and a party of missionaries—were killed or injured when the Islamic State of Iraq and the Levant, also known as the "Islamic State" or "ISIS," caused the suicide bombing of the Brussels International Airport in Belgium in March 2016. Justin Shults, Stephanie Shults-Moore and Gail Martinez perished from their injuries, and Melchizedek "Kato" Martinez, Kianni Martinez, Ka.M., Kimo Martinez, N.M., Joseph "Dres" Empey, Carolyn Moore, Richard Norby, and Mason Wells were injured in the blast but survived. This case is brought by these victims (or their estates) and their immediate family members against the Syrian Arab Republic under the terrorism exception to the Foreign Sovereign Immunities Act, or FSIA. Relying in part on the evidence provided to this Court in *Winternitz v. Syrian Arab Republic*, No. 17-cv-2104 (TJK), 2022 WL 971328 (D.D.C. Mar. 31, 2022) and reflected in *Doe v. Syrian Arab Republic*, No. 18-cv-0066 (KBJ), 2020 WL 5422844 (D.D.C. Sept. 10, 2020), this Court again finds that Syria is liable for injuries caused by the Brussels Airport attack because of its material support to ISIS. Thus, as explained below, it will grant Plaintiffs' motion for default judgment against Syria.

## I.    Background

### A.    Legal Background

In *Winternitz*, this Court found Syria liable for the Brussels Airport attack in March 2016 through its material support to ISIS.  2022 WL 971328, at *9.  The Court relied on, among other sources, the report of Dr. Matthew Levitt which Plaintiffs have also submitted with their motion.[1] *Id.* at *6; ECF No. 22-2.  Other Courts in this District have found the same in cases with similarly situated plaintiffs.  *See, e.g.*, *Doe*, 2020 WL 5422844.

The Court is permitted by Rule 201 of the Federal Rules of Evidence to take "judicial notice" of adjudicative facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).  "This ability to take notice of adjudicative facts extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (compiling cases).  "Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Id*.  And "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced.'" *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (citation omitted). "Thus, the factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case." *Akins v. Islamic Republic of Iran*, 332

---

[1] In *Winternitz*, the Court qualified Dr. Levitt as an expert on "the Syrian government's relationship with ISIS's predecessor organizations and ISIS itself." *Winternitz*, 2022 WL 971328, at *6 n.4.

F. Supp. 3d 1, 11 (D.D.C. 2018).  That said, the Court, as it must, reaches its own, independent findings of these facts here.  *Rimkus*, 750 F. Supp. 2d at 172.

The Court determines that the above-articulated approach "is both efficient and sufficiently protective of the absent defendants' interests" and will adopt it, *Atkins*, 332 F. Supp. 3d at 11, taking judicial notice of the evidence previously presented in *Winternitz* and *Doe*.  In addition, of course, the Court considers Plaintiffs' own evidence as well.

### B.    Factual Background

#### 1.    Syria and the Rise of ISIS

Ample evidence shows that Syria provided safe haven and support to terrorist organizations within its borders for decades, including the organization that would morph into ISIS.  *See* ECF 22-2 at 2; *see also* 45 Fed. Reg. 33956 (May 21, 1980).  In the early 2000s, the Zarqawi organization, or network—a predecessor to ISIS—operated from Syrian territory and received funding and resources from Syria.  *See* ECF No. 22-2 at 26–30; *see also Doe*, 2020 WL 5422844, at *9.  For years, Syria allowed the Zarqawi organization to operate unfettered within its borders by providing "safe haven and support," with a "logistical facilitation network" to usher terrorists into other countries, including Iraq and Jordan.  ECF No. 22-2 at 34; *see Doe*, 2020 WL 5422844, at *9.

After the beginning of the Arab Spring uprising in 2011, Syria's support for terrorist groups became a "strategic decision . . . in part to portray all the regime's opponents as terrorists," thereby aiding former Syrian President Bashar al-Assad to keep power.  *Winternitz*, 2022 WL 971328, at *7.  Syria's support took several forms: it released key ISIS members from Syrian prisons; it purchased oil and wheat from ISIS, allowing the group to raise revenue; and it served as an intermediary allowing ISIS access to the international banking system.  *Id.*; *see also* ECF No. 22-2 at 24–25.  The Syrian military also cooperated with ISIS, refraining from attacking ISIS forces and facilitating ISIS's attacks on moderate opposition forces.  *See* ECF No. 22-2 at 17–18.  This

cooperation allowed ISIS to develop into a "powerful terrorist group" that "controll[ed] large swaths of territory and . . . carr[ied] out acts of international terrorism around the world." *Id.* at 2.

### 2.    The Brussels Airport Attack

On March 22, 2016, ISIS suicide bombers carried out a coordinated attack on Brussels Zaventem International Airport and a nearby metro station. *Winternitz*, 2022 WL 971328, at *1; ECF No. 22-1 at 16; ECF No. 22-2 at 2, 7–8.  Two bombers deployed their explosives by the airport check-in counters just before 8:00 a.m. local time, and a third detonated his explosive on the Brussels Metro an hour later.  ECF No. 1 at 22–23.

Justin Shults and Stephanie Moore-Shults, an American couple living in Brussels, were there to drop off Moore-Shults's mother, Carolyn Moore, who was returning home to Kentucky after a visit.  ECF No. 1 at 24–25.  The explosion hit as Moore was waiting in the security line and Shults and Moore-Shults were waiting to see her off.  *Id*.  Shults and Moore-Shults were both killed in the blast, and Moore was injured.  ECF No. 22-1 at 68–70.

The Martinez family—Gail and Kato Martinez and their four children—were traveling from their home in the Netherlands, where Kato Martinez was stationed at NATO Joint Forces Command Headquarters, to Florida for a vacation.  ECF No. 22-1 at 89–90.  The explosion hit while the family was waiting in line to check their bags.  *Id.* at 90.  Gail Martinez was killed, and Kato Martinez and their children were severely injured by the heat and force of the explosion and by shrapnel.  *Id.* at 90–92.

Dres Empey, Richard Norby, and Mason Wells, missionaries with the Church of Jesus Christ of the Latter-Day Saints living in Belgium, had traveled to the airport together to assist a fellow missionary traveling back to the United States.  ECF No. 22-1 at 135, 158.  They were waiting to check her luggage when the explosion occurred.  *Id.* at 135, 159.  Each suffered injuries from the blast.  *Id.* at 135–136, 159, 176.

In total, the Brussels Airport attack killed 32 people and injured about 250 more.  ECF No. 1 at 23–24.  Following the attack, ISIS claimed responsibility in its online newspaper *Dabiq* and through its Amaq news agency.  ECF No. 1 at 23; ECF No. 22-2 at 7–8.

### 3.    Procedural History

Plaintiffs sued Syria in September 2021 under the terrorism exception to the FSIA to seek damages for injuries caused by the Brussels Airport attack.[2]  *See* ECF No. 1.  Plaintiffs moved to dispense with service by mail pursuant to 28 U.S.C. § 1608(a)(3) upon a showing that no international mail carrier could provide service to Syria.  ECF No. 11.  The Court granted the motion, and the Clerk of Court sent a copy of Plaintiffs' summons and complaint to the State Department to carry out diplomatic service pursuant to 28 U.S.C. § 1608(a)(4).  ECF No. 15.  Service was effectuated on Syria through the Embassy of the Czech Republic in Damascus in June 2022.  ECF No. 16.  Syria did not respond to Plaintiffs' complaint or otherwise appear to defend itself.  In February 2023, the Clerk of the Court entered default judgment against Syria, ECF No. 19, and Plaintiffs then moved for default judgment, ECF No. 22.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," so "'the default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially

---

[2] Plaintiffs are the Estate of Justin Shults, his parents, and two siblings; the Estate of Stephanie Moore-Shults, her parents (including her mother Carolyn Moore), her sister, and her mother's two siblings; the Estate of Gail Martinez, her parents, and her four siblings; Kato Martinez, his mother, his sister, and the four children of Gail and Kato Martinez; Dres Empey, his parents, and his four siblings; Richard Norby, his wife, and their three children; and Mason Wells, his parents, and his four siblings.

unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

Still, "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). A court retains its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. And "plaintiffs retain 'the burden of proving personal jurisdiction, [and] they can satisfy that burden with a prima facie showing.'" *Id.* at 7 (emphasis removed) (quoting *Edmond v. U.S. Postal Serv. Gen. Couns.*, 949 F.2d 415, 424 (D.C. Cir. 1991)). In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea,* 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (alteration in original) (quoting 28 U.S.C. § 1608(e)). And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).

As a result, "courts have the authority—indeed . . . the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*,

641 F.2d 934, 951 (D.C. Cir. 1981)).  To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  But uncontroverted factual allegations supported by admissible evidence may be taken as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).  And § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge."  *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).

In a FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows 'her claim has some factual basis,' . . . even if she might not have prevailed in a contested proceeding."  *Owens*, 864 F.3d at 785 (citations omitted).  "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign."  *Id*.  Thus, courts are given "an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism."  *Id*.  And this discretion extends to the admission of expert testimony, often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id*. at 787 (citations omitted).  Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate" and "[t]he sovereigns themselves often fail to appear and to participate in discovery."  *Id*.  For these reasons, the D.C. Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception."  *Id*.

### III.    Analysis

### A.    Subject-Matter Jurisdiction under the FSIA

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in a United States court" in a civil action. *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017).  Under 28 U.S.C. § 1330(a), district courts have jurisdiction over (1) "any nonjury civil action" (2) "against a foreign state" (3) for "any claim for relief *in personam*," but only if (4) the state "is not entitled to immunity." (emphasis added).  The first three requirements are met.  Plaintiffs have brought a nonjury civil action against Syria, a foreign sovereign, seeking money damages. *See* ECF No. 1 at 48–49.

Thus, immunity is the remaining jurisdictional hurdle.  Typically, foreign states are "immune from the jurisdiction" of United States courts.  28 U.S.C. § 1604.  The FSIA's terrorism exception, however, nullifies that immunity—and thus unlocks jurisdiction—when certain conditions are met.  Relevant here, Plaintiffs must prove three elements to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimants or victims were nationals of the United States at the time of the act; and (3) the damages sought are for personal injury or death "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."[3]

---

[3] The FSIA also requires plaintiffs who seek to sue a foreign state for causing an injury in that state to extend an offer to arbitrate before bringing a claim in a federal district court.  28 U.S.C. § 1605A(a)(2)(A)(iii).  But here, the attacks occurred in Belgium, not in Syria, so that requirement does not apply. *Winternitz*, 2022 WL 971328, at *4 n.1; ECF No. 22-1 at 14.

§ 1605A(a); *see also Mohammadi v. Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).  Plaintiffs have met their burden on all three elements.

### 1.    The United States Designated Syria a State Sponsor of Terrorism

The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated ever since.  *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33956 (May 21, 1980).

### 2.    Plaintiffs are U.S. Nationals

All Plaintiffs were at relevant times United States citizens.  ECF No. 22-1 at 14.  And United States citizens are nationals for purposes of the FSIA.  *See* 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### 3.    Plaintiffs Seek Damages for Personal Injury or Death Caused by an Extrajudicial Killing Resulting from Syria's Material Support to ISIS

The third element of subject-matter jurisdiction under the FSIA terrorism exception is that Plaintiffs seek damages for personal injury or death caused by the foreign state's "provision of material support or resources" for at least one terrorist act enumerated in the statute, one of which is "extrajudicial killing."  28 U.S.C. § 1605A(a)(1).  Plaintiffs allege that Syria provided material support to ISIS, ISIS carried out an extrajudicial killing in the form of the Brussels Airport attack, and that attack killed three of them and injured the rest in one way or another.  *See* ECF No. 22-1 at 8, 32–37.  Plaintiffs have met their burden.[4]

---

[4] At times, Plaintiffs appear to invoke § 1605A(a)(1)'s torture provision.  *See* ECF No. 1 at 9; ECF No. 22 at 2.  The Court need not address this point.  Having found that the Brussels Airport attack was an act of extrajudicial killing as defined by the FSIA, no further act need be alleged for the Court to establish jurisdiction.  *See Winternitz*, 2022 WL 971328, at *5 n.2.

a.      **The Brussels Airport Attack Was an Extrajudicial Killing**

The state-sponsored terrorism exception to the FSIA defines "extrajudicial killing" through

reference to the Torture Victim Protection Act of 1991.  28 U.S.C. § 1605A(h)(7).  Under that Act,

an "extrajudicial killing" is:

> a deliberated killing not authorized by a previous judgment pronounced by a regu-
> larly constituted court affording all the judicial guarantees which are recognized as
> indispensable by civilized peoples.  Such term, however, does not include any such
> killing that, under international law, is lawfully carried out under the authority of a
> foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (Mar. 12, 1992), *codified*

*at* 28 U.S.C. § 1350 (note).  This definition "contains three elements: (1) a killing; (2) that is de-

liberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted

court."  *Owens*, 864 F.3d at 770.  As this Court in *Winternitz* concluded, "a 'suicide bombing in a

crowded airport that resulted in many deaths would plainly meet those requirements.'"  2022 WL

971328, at *5 (quoting *Doe*, 2020 WL 5422844, at *8).  Based on the same evidence and for the

same reasons, the Court reaches the same conclusions again.  The Court also notes, as it did in

*Winternitz*, that although three Plaintiffs here died from injuries sustained in the Brussels Airport

attack, Plaintiffs "need only establish that the bombing here was authorized, deliberate, and that

there were [deaths].  It is not necessary, however, for one of the plaintiffs to have died in the attack

in order for the state-sponsor-of-terrorism exception to apply."  *Cohen v. Islamic Republic of Iran*,

238 F. Supp. 3d 71, 81 (D.D.C. 2017); *see also Karcher v. Islamic Republic of Iran*, 396 F. Supp.

3d 12, 58 (D.D.C. 2019) (collecting cases).

b.      **Syria's Material Support to ISIS Proximately Caused the
        Brussels Airport Attack**

The attribution of the Brussels Airport attack in March 2016 to ISIS is straightforward.

The Court considered the issue in *Winternitz*.  There, this Court found, based on the evidence

before it, that "ISIS was responsible for the Brussels Airport attack." *Winternitz*, 2022 WL 971328, at *6. ISIS claimed responsibility for the attack, including in its English-language publication, and the State Department and the report of Dr. Levitt draw the same conclusion. *Id.* at *6; ECF No. 22-2 at 7–8.

The necessary link under § 1605 is, therefore, a showing that ISIS's extrajudicial killing was "caused by . . . the provision of material support or resources . . . by an official, employee, or agent" of Syria. 28 U.S.C. § 1605A(a)(1). Section 1605A(h)(3) of the FSIA defines "material support or resources" as having the meaning provided in 18 U.S.C. § 2339A:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). And under the FSIA, a plaintiff need only show proximate cause. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). This requires a showing of a "reasonable connection between the material support provided and the ultimate act of terrorism." *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017) (quoting *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011)) (cleaned up). So Plaintiffs must establish (1) that Syria's provision of material support was a "'substantial factor' in the sequence of events" that led to the Brussels Airport attack, and (2) that the injuries sustained in the attack were "'reasonably foreseeable or anticipated as a natural consequence' of [Syria's] conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

Again, the Court considered this requirement in *Winternitz*, finding there that plaintiffs had met their burden of showing that "Syria provided material support and resources to ISIS." *Winternitz*, 2022 WL 971328, at *6. Syria's material support included the release of "key ISIS

members from its prisons with the specific purpose of strengthening ISIS," as well as "financial assistance" "by the purchasing oil from ISIS and wheat from ISIS-controlled areas, as well as by allowing Syrian banks to provide ISIS financial services," *id.* at *7, all of which fit the definition of material support under 18 U.S.C. § 2339A(b)(1). And the Court found that plaintiffs' injuries from the Brussels Airport attack were "reasonably foreseeable consequence[s] of Syria's actions supporting ISIS." *Winternitz*, 2022 WL 971328; *see also Doe*, 2020 WL 5422844, at *12 (finding Syria liable for the Brussels Airport attack). Without the support provided to it by the Syrian regime, ISIS "could not have evolved . . . into the powerful terrorist group it became, . . . carrying out acts of international terrorism around the world." ECF No. 22-2 at 2.

For these reasons, the Court concludes that all § 1605 elements are satisfied and finds it has subject-matter jurisdiction over Plaintiffs' claims.

### B.    Personal Jurisdiction over Syria

The Court has personal jurisdiction over Syria if it has subject-matter jurisdiction over Plaintiffs' claims and Syria was properly served. *See* 28 U.S.C. § 1330(b). As explained above, the Court has subject-matter jurisdiction. And as detailed below, Plaintiffs properly served Syria through the State Department.

The FSIA provides four options to serve a foreign state. *See* 28 U.S.C. § 1608(a). The first two options are unavailable because Syria and the United States have no "special arrangement for service," *see id.* § 1608(a)(1), and because Syria is not party to an "applicable international convention on service," *see id.* § 1608(a)(2). Option three entails asking the Clerk of Court to "send[] a copy of the summons and complaint and a notice of suit," with translations of each, "to the head of the ministry of foreign affairs" of Syria. *Id.* § 1608(a)(3). And option four is requesting that the Clerk send two copies of those materials to the State Department so that "service can be effected through diplomatic channels." *Saberi v. Gov't of Islamic Republic of Iran*, 541 F. Supp.

3d 67, 81 (D.D.C. 2021) (citing § 1608(a)(4)).

Plaintiffs tried option three in November 2021 but discovered that no common carrier would deliver to Syria. *See* ECF No. 11 ¶¶ 10–12. Plaintiffs then requested that the Court begin option four. *See generally id*. The State Department confirmed that the service documents had been delivered to the Syrian Ministry of Foreign Affairs through the Czech Embassy in Damascus. ECF No. 16. Thus, Plaintiffs "satisfie[d] § 1608(a)(4)," which establishes personal jurisdiction over a foreign state like Syria. *Saberi*, 541 F. Supp. 3d at 81 (citation omitted).

### C.     Syria's Liability to Plaintiffs

Courts have taken two approaches when assessing a foreign state's liability to plaintiffs bringing claims under the FSIA. The first approach reasons that the immunity-waiver inquiry and liability question are conceptually distinct but functionally coextensive. That is, a plaintiff who "establish[es] a waiver of foreign sovereign immunity under § 1605(a)" also "establish[es] entitlement to relief as a matter of federal law." *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 176 (D.D.C. 2020). "Essentially," then, "liability under § 1605A(c) will exist whenever the jurisdictional requirements" are met. *Hekmati*, 278 F. Supp. 3d at 163. So under this analysis, Plaintiffs have established that Syria is liable for their injuries because they have proven that Syria's material support was a proximate cause of ISIS's underlying acts. *See, e.g.*, *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 155 (D.D.C. 2010).

The result is the same under the second approach. On this view, § 1605A(c) creates a private right of action but "provides no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 178 (D.D.C. 2019). So a FSIA plaintiff must still "prove a theory of liability found in well-established principles of law, such as those found in the Restatement (Second) of Torts." *Saberi*, 541 F. Supp.

3d at 81 (quotation marks and citation omitted).  Plaintiffs claim intentional infliction of emotional distress as their theory of liability.[5]  ECF No. 1 ¶¶ 203–207 (Count III).

A claim of intentional infliction of emotional distress requires proof that Syria, "by extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to them." *Rezaian*, 422 F. Supp. 3d at 179 (cleaned up) (citation omitted).  Plaintiffs who were not present at the airport when the attack happened—who were not themselves the "direct recipient of the 'extreme and outrageous conduct'"— must also show they are a "member of" the "immediate family" of a victim of the attack. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81 (D.D.C. 2017). They must also show that the underlying actions were "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Id.* (alteration in original) (quoting *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26–27 (D.D.C. 2009)).

Plaintiffs have proven these elements.  Each Plaintiff who was not present for the attack is an immediate family member of someone injured or killed in the blast.  *See* ECF No. 22-1 at 39, 49, 53, 60, 71, 74, 78, 82, 113, 116, 118, 120, 123, 127, 129, 130, 140, 165, 170, 172, 173, 179–80.  And Courts in this district have found that terrorist attacks like the Brussels Airport attack meet the sufficiently "outrageous" standard: "terrorism is 'unique among the types of tortious activities in both its extreme methods and aims,' in that it is 'intended to cause the highest degree of

---

[5] The full record, however, could likely also sustain a theory of liability grounded in the tort of battery, at least for the subset of Plaintiffs who were present at the airport and physically injured or killed in the attack.  Battery "requires an act 'intending to cause a harmful or offensive contact with'" another so long as "offensive contact in fact 'directly or indirectly results.'" *Saberi*, 541 F. Supp. 3d at 82 (quoting Restatement (Second) of Torts § 18).  In the case of the Brussels Airport attack, it is self-evident that the perpetrators intended to cause harmful or intensive contact. "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of such harm." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010).

emotional distress, literally, terror.'" *Doe*, 2020 WL 5422844, at \*14 (quoting *Heiser*, 659 F. Supp. 2d at 27); *see also Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Thus, Plaintiffs have all shown sufficient evidence of the injuries they suffered resulting from the Brussels Airport attack. The evidence in the record, referenced again below, more than suffices to show that Syria is liable to each Plaintiff on an intentional infliction of emotional distress theory. *See Doe*, 2022 WL 5422844, at \*14 (finding Syria liable for injuries sustained in the Brussels Airport attack under IIED); *Winternitz*, 2022 WL 971328, at \*9 (same).

## IV.    Damages

The FSIA provides for the award of "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). Plaintiffs seek compensatory damages, to encompass pain, suffering, and solatium. ECF No. 22-1 at 197–98. They also seek economic damages for Justin Shults, Stephanie Moore-Shults, Gail Martinez, Dres Empey, and Court Empey. ECF No. 22-1 at 39, 64, 85, 139, 142. And they seek punitive damages. *Id.* at 200–01.

As noted above, Plaintiffs have also provided the Court with substantial evidence of their requests for damages. *See, e.g.*, ECF No. 22-1; ECF No. 22-4; ECF No. 22-9; ECF No. 25-2; ECF No. 34-1; ECF No. 34-2. Still, the FSIA expects that Courts may wish to "appoint special masters to hear damage claims" brought under the terrorism exception. 28 U.S.C. § 1605A(e)(1). Special masters may be appropriate when they "would not impose undue expenses on any party and will not result in unreasonable delay." *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 17 (D.D.C. 2011) (citing Fed. R. Civ. P. 53(a)(3)); *see Cohen*, 238 F. Supp. 3d at 86–87. The Court finds that because of the number of Plaintiffs here—44 in all—their wide array of injuries, and the need to calculate economic loss for some Plaintiffs, the appointment of a special master would "affirmatively assist the Court in the efficient resolution of claims." *Taylor*, 811 F. Supp. 2d at 17. The

Court will therefore "invoke its power" to make an appointment of a special master, who shall weigh the evidence and submit to the Court a report and recommendation regarding compensatory damages for each Plaintiff.  *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 338 (D.D.C. 2014).

**V.      Conclusion**

For all the above reasons, the Court will grant Plaintiffs' Motion for Default Judgment. Further, within 30 days, the Court will require Plaintiffs to recommend a special master to assist the Court in calculating compensatory damages.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 30, 2025